**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ANGELA C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:17-CV-1991-N-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for determination of non-dispositive motions and issuance of findings, conclusions, and recommendation on dispositive motions.  Before the Court are *Plaintiff's Appeal from the Decision of the Acting Commissioner of Social Security*, filed November 27, 2017 (doc. 16), and *Defendant's Brief and Motion for Summary Judgment*, filed December 22, 2017 (doc. 17).  Based on the relevant filings, evidence, and applicable law, the defendant's motion should be **DENIED IN PART**, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further proceedings.

**I.  BACKGROUND**[1]

Angela C. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

- 1 -

of the Social Security Act (Act).  (docs. 1; 16 at 3.)

A.    **Procedural History**

On April 24, 2014, Plaintiff applied for SSI, alleging disability beginning on April 24, 2014. (R. at 120.)  Her claim was denied on July 15, 2014, and upon reconsideration on November 25, 2014. (R. at 120-43.)  On December 9, 2014, she requested a hearing before an Administrative Law Judge (ALJ).  (R. at 161-62.)  She appeared and testified at a hearing on March 7, 2016.  (R. at 56-97.)  On April 26, 2016, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits.  (R. at 10-25.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 21, 2016.  (R. at 209.)  The Appeals Council denied her request for review on July 5, 2017.  (R. at 1-4.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on May 7, 1965, and was 50 years old at the time of the hearing.  (R. at 20, 68.)  She had at least a high school education and could communicate in English.  (R. at 20.) She had past relevant work experience as a mail clerk.  (*Id*.)

2.    **Medical Evidence**[2]

Plaintiff received treatment from Ikechukwu Ofomata, M.D., at Metrocare Services (Metrocare) multiple times between May 9, 2012 and May 19, 2014.  (R. at 324-60, 364-66, 368-76, 378-80, 385-87.)  Dr. Ofomata noted that Plaintiff had previously been diagnosed with bipolar disorder.  (R. at 324, 330, 335, 341, 346, 352, 358, 364, 368, 371, 374, 378, 385.)  Throughout her

---

[2] Because only evidence of Plaintiff's mental impairments are at issue, physical medical evidence is noted only when it includes information relevant to the mental impairments at issue.

appointments she was adequately groomed, cooperative, oriented, alert, and had no psychotic features, organized thought content, euthymic affect, intact memory, impaired attention, no anxieties, and fair insight, judgment, and impulse.  (R. at 325, 331, 336, 342, 347, 353, 358-59, 364-65, 368-69, 371-72, 347-75, 378-79, 385-86.)  Her mood generally fluctuated between good and okay, and her psychomotor activity was noted as either normal or showing "retardation."  (R. at 325, 331, 336, 342, 347, 353, 358, 364, 368, 371, 374, 378-79, 385.)

On May 9, 2012, Plaintiff reported that she worked in a "mailing job" with her mother and enjoyed it.  (R. at 325.)  She was compliant with her medications, slept at night, and denied having suicidal or homicidal ideation, intent, or plans.  (R. at 325.)

On June 5, 2012, diagnostic scales showed her as having ratings of 2 for support needs, psychiatric related hospitalizations, and functional impairment.  (R. at 329.)

On August 2, 2012, Plaintiff reported that she was tired all the time, did not drink enough water, and found herself to often be in a warm environment even though she was on lithium therapy.  (R. at 336.)

On September 27, 2012, her diagnostic scales testing showed her support needs rating as 2, and her functional impairment rating as a 1.  (R. at 340.)

On February 28, 2013, diagnostic scales placed her risk of harm rating at a 3, and her support needs and functional impairment ratings at a 2.  (R. at 351.)

On June 20, 2013, Plaintiff stated that she had not taken her medications for at least 4 weeks, and reported racing thoughts, poor sleep, initial insomnia, mood swings, and impulsive behavior, but no thoughts of hurting herself.  (R. at 358.)  Dr. Ofomata noted that Plaintiff was "unstable since being off her med[ications]."  (R. at 359.)  Her mood was depressed at that appointment, and

3

diagnostic scales rated her risk of harm and support needs at a 3, and her functional impairment at a 2. (R. at 357, 359.)

On September 19, 2013, Plaintiff reported that she cried without much provocation, and her mood was "not too good" because she was denied disability for the second time. (R. at 364.)

On October 15, 2013, Dr. Ofomata noted that Plaintiff was stable while on her medications, and she continued to comply with them. (R. at 368.)

On January 7, 2014, Plaintiff reported anxiety despite taking her medication, her mood was anxious, and she stated that she was planning on moving out of her mother's home and into her daughter's home. (R. at 374.)

On March 20, 2014, Plaintiff reported that she was doing well on her medications, and stated that she took care of her grandchildren, cleaned the house, and enjoyed watching movies regularly. (R. at 378.)

On May 19, 2014, Plaintiff was with her mother and reported that she felt anxious and irritable, and had a tendency to easily have angry outbursts. (R. at 385.) She thought her life had changed a lot from how it used to be, and her mother confirmed the same. (*Id.*) She would be okay for a while and then relapse, but stated that she was compliant on her medications. (*Id.*)

On April 17, 2014, Plaintiff was seen by Stephen Bengston, R.N., at Metrocare. (R. at 382-83.) Her mental status exam showed that she was stable, and she denied being suicidal or homicidal. (R. at 382.) She was well-nourished, adequately groomed, cooperative, friendly, organized, goal-directed, calm, alert, oriented, and she had no signs of psychosis. (*Id.*) She reported normal sleep and appetite. (*Id.*)

On July 9, 2014, in her Function Report - Adult, Plaintiff reported that she lived with her

4

mother, her illness was mental, and she was bipolar I, manic depressive. (R. at 248, 253, 255.) She stated that she had mental breakdowns, did not have the ability to concentrate without breaking down, could not focus, cried all the time, and sometimes could not handle crowds because she would get paranoid. (R. at 248.) She would sometimes help her mom clean, and had sleeping problems due to her illness. (R. at 249.) Her mental issues made it hard for her to dress, bathe, and care for her hair at times. (*Id*.) She helped her mom prepare meals on a daily basis, which took about 30 minutes to 1 hour. (R. at 250.) She helped clean and did her own laundry for about "1 hour or so and once each week," and it was helpful for her to watch her mom do it. (*Id*.) She reported that she went outside daily and could go out alone, but she did not drive. (R. at 251.) She shopped for food a couple of times per week, for "maybe 10-15 minutes" at a time. (*Id*.) She was unable to pay bills, handle a savings account, or use a checkbook or money order because she did not "have any of these things," but she could count change. (*Id*.) She could not handle a job. (R. at 252.) She watched television for several hours a day, and would watch television when she spent time with others. (*Id*.) She did not go anywhere on the regular basis other than the store, did not need reminding to go places, and did not need anyone to accompany her. (*Id*.) She reported problems getting along with family, friends, neighbors, and others due to mood swings and her inability to cope. (R. at 253.) She could not "get out and socialize" due to her conditions. (*Id*.)

Plaintiff reported that her conditions affected her abilities to stand, walk, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. (*Id*.) She could walk "maybe 100 [feet]" before needing to rest for at least 5 minutes, could follow written instructions such as a recipe, and she had trouble following spoken instructions. (*Id*.) She could get along "fine" with authority figures, had been fired from jobs due

to problems getting along with others, did not handle stress well, and had fear of "getting in trouble or not getting it right." (R. at 254.) She needed glasses all the time. (*Id.*) She was taking Lithium for dizziness, Hydroxyzine for anxiety, Venlafaxine for mood swings, and Risperidone to help her sleep. (R. at 255.)

Also on July 9, 2014, Plaintiff's mother completed a Function Report - Adult, for Plaintiff. (R. at 257-64.) She stated that she spent every day with Plaintiff, and they did chores together. (R. at 257.) Plaintiff was "mentally unable to function sometimes in an everyday setting at home or out in public." (*Id.*) Her activities varied from day-to-day, depending on her depression, and she would routinely bathe, help with some chores when she could, eat, and go to bed. (R. at 258.) Plaintiff did not take care of anyone else or any animals. (*Id.*) Before her illness, Plaintiff could work part time, but she had her conditions most of her life. (*Id.*) Plaintiff's conditions affected her sleep such that she would be restless and would get up throughout the night. (*Id.*) She needed to be reminded to take her medications at times. (R. at 259.) Plaintiff helped her mother prepare meals when she could, and helped with laundry and cleaning. (*Id.*) Plaintiff needed help/encouragement to get her to try to help her mother out because she had depression and could barely function at times. (*Id.*) Plaintiff's mother reported that Plaintiff would sit outside for a few minutes each day, could not go out alone, was always with her, could shop for food with her, and could count change. (R. at 260.) Plaintiff could not pay bills, handle a savings account, or use a checkbook or money order because she would get confused. (*Id.*) Plaintiff watched television daily with her mother and stayed at home. (R. at 261.) Plaintiff had problems getting along with family, friends, and neighbors because she was easily aggravated and did "not fit in those settings well." (R. at 262.) Plaintiff never wanted to participate in any family settings or settings with people; she stayed to herself. (*Id.*)

6

Plaintiff's mother opined that Plaintiff's conditions affected her abilities to remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (*Id*.) She could not walk far before needing to rest a few minutes, could pay attention for only "10-15 minutes" because she would get angry, could not finish what she started, could usually follow written instructions, and could not follow spoken instructions very well. (*Id*.) Plaintiff was respectful of authority figures, but had previously been fired from her mail clerk job because of problems getting along with others. (R. at 263.) She also could not handle stress or changes in routine, appeared hopeless, and was legally blind in her right eye. (*Id*.) Her mother reported that she took Plaintiff to all of her appointments and spoke to the doctor regarding her conditions at times, and that Plaintiff could not function and was bipolar I, manic depressive. (R. at 264.)

On July 14, 2014, Richard Campa, Ph.D., a state agency psychological consultant (SAPC), completed a mental residual functional capacity (RFC) assessment of Plaintiff based on the medical evidence. (R. at 126-28.) He opined that Plaintiff did not have limitations in the areas of understanding and memory, and she was no more than moderately limited in the areas of sustained concentration, persistence, social interaction, and adaptation. (R. at 127-28.) He further opined that Plaintiff was maximally able to understand, remember, and carry out detailed but not complex instructions, make basic decisions, attend and concentrate for extended periods, interact with others, accept instructions, and respond to changes in a routine work setting. (R. at 128.) He noted that Plaintiff's allegations were partially supported by the evidence in the file. (*Id*.)

On July 31, 2014, and September 10, 2014, Plaintiff again met with Dr. Ofomata. (R. at 431-33, 435-37.) In July, Dr. Ofomata noted that Plaintiff was compliant with her medications, and she felt stable. (R. at 431.) Plaintiff stated that she was doing well on her medications, took care of her

7

grandchildren, cooked at times, kept the house clean, and lived with her mother. (*Id*.) Her mother was very supportive of her. (*Id*.) In September, Dr. Ofomata noted that Plaintiff was doing well on her medications. (R. at 435.) Dr. Ofomata also noted that her mother was a huge support in her recovery. (*Id*.) At both appointments, Plaintiff was stable on her medications, active, and able to independently perform activities of daily living. (R. at 432, 436.) She was also adequately groomed, cooperative, alert, and oriented, and had no signs of psychotic features, organized thought, okay mood, no delusions, intact memory, impaired attention, and fair insight, judgment, and impulse. (R. at 431-32, 435-36.) Her psychomotor activity showed "retardation" in July but was normal in September. (R. at 431, 435.) She slept at night, had a decreased appetite, and denied being suicidal or homicidal on both occasions. (R. at 432, 436.)

On November 19, 2014, Plaintiff met with Susan Mbugua, A.P.N, at Metrocare. (R. at 569-72.) Plaintiff reported that she felt depressed and had mood swings "all the time," but denied hallucinations or having suicidal or homicidal ideation. (R. at 569.) She was adequately groomed, cooperative, alert, and oriented, and had normal psychomotor activity, no delusions, no psychotic features, irritable mood, organized thought, blunted affect, intact memory, impaired attention, no anxiety, and fair insight, judgment, and impulse. (R. at 569-70.) She slept at night, had decreased appetite, and she was not suicidal or homicidal. (R. at 570.) Nurse Mbugua increased Risperdal to help stabilize Plaintiff's mood. (R. at 571.)

On November 25, 2014, Michele Chappuis, Ph.D., an SAPC, completed a subsequent mental RFC assessment of Plaintiff. (R. at 139-41.) Her findings were identical to those made by Dr. Campa. (*See id*.)

On December 24, 2014, Plaintiff was seen by Monica Thomas, A.P.N., at Metrocare. (R.

8

at 573-77.)  Plaintiff stated that her mood was depressed, anxious, and irritable, and she reported

decreased sleep, but denied suicidal or homicidal ideation.  (R. at 573.)  She was adequately

groomed, cooperative, alert, and oriented, and had normal psychomotor activity, no delusions, no

psychotic features, anxious mood, organized thought, blunted affect, intact memory, impaired

attention, no anxiety, and fair insight, judgment, and impulse.  (R. at 573-74.)  She slept at night, had

decreased appetite, and was not suicidal or homicidal.  (R. at 574.)  Nurse Thomas increased

Plaintiff's Effexor, Visatril, and Risperdal to treat her anxiety and depression, and to stabilize her

mood.  (R. at 575.)

Plaintiff was again treated by Dr. Ofomata on multiple occasions from January 21, 2015 to

October 15, 2015.  (R. at 578-91, 595-600, 603-07.)  In January, Plaintiff reported sleeping only 2

hours at night, and had gained some weight.  (R. at 578.)  In March, she was stable on her

medications, and her mother supported her.  (R. at 583.)  Her mother stated that Plaintiff helped with

household chores, including cooking and grocery shopping, but did not complete most activities

independently.  (*Id*.)  In May, Plaintiff reported that she was doing well on her medications but was

still having mood swings and could not sleep well at night.  (R. at 588.)  In July, Plaintiff was doing

well and having no side effects from her medications.  (R. at 595.)  In August, Plaintiff's functional

disability assessment showed that she was having crying spells, appetite disturbance, sleep

disturbance, "flight of ideas," racing thoughts, and chronic depression.  (R. at 600.)  It was also

noted that she had underlying mental impairments, and her mental disorder contributed to her

pain/fatigue.  (*Id*.)  In October, she was doing well on her medications, but she reported that she had

been "stretching" her medications to last her because she missed an appointment.  (R. at 603.)

Throughout these appointments, she was adequately groomed, cooperative, euthymic, alert, oriented,

9

and had normal psychomotor activity, no psychotic features, no delusions, organized thought, intact memory, impaired attention, no anxieties, and fair insight, judgment, and impulse. (R. at 578-79, 583-84, 588-89, 595-96, 603-04.) She also slept at night, had a decreased appetite, and was not suicidal or homicidal. (R. at 579, 584, 589, 596, 604.) Her mood was okay at two appointments, and she was anxious and moody at one appointment. (R. at 593, 595, 603.)

On August 25, 2015, Dr. Ofomata completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" for Plaintiff. (R. at 565-67.) Dr. Ofomata opined that Plaintiff had "extreme loss of ability to perform" in the following categories: maintaining concentration for an extended period (being 2 hours); maintaining attention or staying on task for an extended period (being 2 hours); performing at a consistent pace without an unreasonable number and length of rest periods or breaks; acting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavior extremes; behaving in an emotionally stable manner; responding appropriately to changes in a routine work setting; and coping with normal work stress (even those inherit in low stress jobs) without exacerbating pathologically-based symptoms. (R. at 565-66.) He also opined that Plaintiff had "substantial loss of ability to perform" in the following categories: understanding to carry out simple one or two-step instructions; understanding to carry out detailed but uninvolved written or oral instructions; demonstrating reliability by maintaining regular attendance and being punctual within customary tolerances; asking simple questions or requesting assistance; maintaining personal appearance; and finishing a normal work week without interruption from psychologically based symptoms. (*Id.*) Dr. Ofomata noted that during her treatment with him, Plaintiff manifested signs of crying spells, appetite disturbance, sleep

disturbance, chronic depression, "flight of ideas," and racing thoughts. (R. at 566.) He also noted

that the entries in his prior clinical notes did not conflict with his assessment because Plaintiff had

a residual disease process, and even a minimal increase in mental demands or change in the

environment would be predicted to cause her to decompensate. (R. at 567.) Plaintiff would be

expected to absent from work more than 4 days a month, and her mental disorders exacerbated the

degree of disability she experienced from her physical impairments. (*Id*.) He found that Plaintiff's

underlying mental impairments were severe enough to produce the limitations found in his

assessment. (*Id*.)

On November 12, 2015, Laura Owen, a qualified mental health professional, completed a

living environment safety screening for Plaintiff. (R. at 610.) She determined that Plaintiff did not

need assistance or supervision taking medication, supervision or oversight, or assistance with meals,

dressing, movement, or bathing. (*Id*.)

On December 21, 2015, and January 18, 2016, Plaintiff met with Duncan Mwangi, A.P.N.,

at Metrocare. (R. at 613-17, 619-23.) In December, she reported increased depression and stress,

but did not know why. (R. at 613.) She also reported getting agitated from "little things in life" and

not sleeping well, but she was able to do activities of daily living. (*Id*.) She denied having suicidal

or homicidal ideation. (*Id*.) In January, she reported doing better and stated that she was just there

to get her medications refilled. (R. at 619.) She had no suicidal ideation, intent, or plan, and no

hallucinations. (*Id*.) She also reported medication compliance and the ability to do activities of

daily living. (*Id*.) At both appointments she was adequately groomed, cooperative, anxious, alert,

sad, and oriented, and had normal psychomotor activity, no signs of psychotic features, no delusions,

organized thought process, intact memory, impaired attention, no anxieties, and fair insight,

11

judgment, and impulse. (R. at 613-14, 619-20.)[3]

### 3.    Hearing Testimony

On March 7, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 56-97.) Plaintiff was represented by an attorney. (R. at 58.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 50 years old, attended school up to the 8th grade, and had her GED. (R. at 60.) She lived with her mother, was not responsible for any children, was not working, and had not worked since April of 2014. (*Id.*) She had grandchildren and had taken care of them before, but her mother was with her. (R. at 71-72.)

She worked as a mail clerk at her family's business between 2001 and 2004, which required her to sometimes sort mail and insert mail into envelopes. (R. at 61-62, 68.) At times there were up to 20 people working there, but normally there were only 6 or 7 people. (R. at 76.) While working as a mail clerk, there were times where she only stood while working, and she would sometimes lift 20 pound bundles of mail or 30 pound sacks of mail. (R. at 62-63, 77-78.) Plaintiff was legally blind in her right eye, which caused problems when she worked as a mail clerk because it affected her peripheral vision such that she could not see what was going on around her. (R. at 63-64.) Her blindness caused her to become injured on one occasion when she was struck by the arm of a "tying machine," and she missed a couple of days of work. (R. at 64, 75-76.) She stated that she had problems working with other people and would get angry and "go off on them just out of the blue . . . if [she] thought they [were not] doing something right." (R. at 67.) Her mother would have to remove her from the room, and she was fired several times, but she would be rehired

---

[3] Notably, there are several notes showing that Plaintiff "no showed" at multiple appointments while receiving treatment at Metrocare. (*See* R. at 381, 388, 429-30, 601-02, 608, 612.)

again after a couple of weeks.  (R. at 67-68.)

Plaintiff was taking Lithium, Hydroxyzine for anxiety, Seroquel to stabilize her mood, and another medication she was unable to name.  (R. at 65.)  She had been on depression and anxiety medications for years.  (R. at 66.)  She stated that her medications made her vision blurry, and also made her feel sleepy.  (R. at 66-67, 69.)  Her medications were switched a lot throughout her treatment.  (R. at 68-69.)

Her bipolar disorder made her "not want to come out of [her] room," and she was scared to be around a lot of people, which she defined as 5 or more.  (R. at 66.)  She had this problem since before 2014.  (*Id.*)  She did not know why she did not want to come out of her room, but it happened about 4 times per week, and she would stay in her room the entire day either watching television or sleeping.  (R. at 69.)  She stated that she was very nervous at the hearing and would get very nervous "these days."  (R. at 80.)   Her bipolar disorder made her "dizzy and stuff like that."  (R. at 80-81.) She did not have many friends or interests, although she used to, and she sometimes did housework but had problems finishing due to both mental and physical reasons.  (R. at 81.)  Mentally, she would "just feel like [it was] too much," and she would be overwhelmed.  (*Id.*)  She did not have energy,  cried all the time, and read with difficulty because she could not maintain her concentration/focus.  (R. at 81-82.)

She did not sleep very well at night even on Seroquel, and she thought she needed an increased dosage.  (R. at 70.)  Because she could not sleep all night, she would fall asleep around 7 or 8 in the morning and sleep for a few hours during the day.  (R. at 70-71.)  She was more likely to fall asleep when the sun was coming up, and she would keep her room dark because she was more comfortable that way.  (R. at 82.)  She would look out her window at times because she thought

people were watching her, and she also thought people would talk about her. (R. at 82-83.) When her parents would try to take her out to eat, she would have to sit facing the front door and did not want anyone to be behind her. (R. at 83.) She did not leave the house by herself and did not want to because she was scared. (*Id.*) She also had nightmares about 4 times a week, and had panic attacks "all the time" that were caused by going out because she could not be around people. (R. at 83-84.) She talked to Dr. Ofomata about how she felt, and he would suggest that she talk to him, have interactions with her daughter, or try to go to church to feel better. (R. at 72.)

She also testified that she had painful knots on her feet, and she felt them when her feet started hurting. (R. at 72-73.) Her feet would also swell, and she would elevate them while sitting on the couch. (R. at 73, 78.) She was using a thick pad in her shoes that somewhat helped the pain in her feet. (R. at 73-74.)

She lived with her mother and stepfather. (R. at 84.) Her mother did the cooking and vacuuming, and she would try to help her with the rest of the housework. (R. at 86-87.) She was not much help to her mother, but she would try. (R. at 87.) She went to church about once a month, sat in the back, and did not have any friends there. (*Id.*) She did not belong to any committees, did not do visitations at the hospital, and did not drive. (R. at 87-88.) She was twice divorced and had suffered physical and mental abuse from one of her ex-husbands from 1979-2000. (R. at 78, 84-85.) She suffered sexual abuse when she was 8-12 years old by her ex-stepfather's nephews and her aunt, and then again at age 42 by her biological father. (R. at 84-86.) She stated that at the time of the hearing, her father had just been released from prison, and that made her nervous and afraid. (R. at 86.) She would look for her father out her window. (*Id.*)

### b.    VE's testimony

The VE testified that Plaintiff's past work experience as a mail clerk was classified in the Dictionary of Occupational Titles (DOT) as light and unskilled, with an SVP of 2.  (R. at 89.)  Based on Plaintiff's testimony regarding her duties as a mail clerk, the VE stated that Plaintiff "performed the job overall at the medium level" with an SVP of 2.  (*Id*.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and past work experience as Plaintiff.  (R. at 90.)  The hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; never perform work requiring good depth perception such as driving; never work at unprotected heights or with hazardous machinery; understand, remember, and carry out simple instructions and perform simple tasks; and have no more than occasional interaction with the public or coworkers.  (*Id*.)  The ALJ asked if this hypothetical individual could perform any of Plaintiff's past work.  (*Id*.)  The VE responded that the hypothetical individual could perform the duties of a mail clerk, DOT 209.687-026 (light), as they are routinely performed and defined in the DOT.  (*Id*.)  The ALJ then asked the VE if there was other work the hypothetical individual could perform.  (R. at 91.)  The VE responded that the individual could work in jobs classified as light, sedentary, and unskilled, which were performed relatively independently of others, with an SVP of 2.  (*Id*.)  The VE stated that there were about 100,000 of those jobs nationally, about 10 percent of which were in Texas.  (*Id*.)  The VE then stated that the individual could also work as a hand packager, DOT 559.687-074 (SVP2, light, unskilled), with about 80,000 jobs nationally, 10 percent of which were in federal regional areas; or a cleaner/housekeeper, DOT 323.687-014 (SVP 2, light, unskilled), with

about 300,000 jobs nationally, 10 percent of which were in the federal region. (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual of the same age, education, and past work experience as Plaintiff that could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk less than 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; never perform work that required good depth perception such as driving; never work at unprotected heights or with hazardous machinery; never persist at work for a full 8-hour workday without frequent, unscheduled rest breaks, including the freedom to sit with feet elevated up to two hours during an 8-hour workday; never understand, remember, and carry out very short and simple instructions on a regular and sustained basis; never sustain an ordinary routine without special supervision on a frequent basis; never work in coordination with or in close proximity to others; have essentially no interaction with the public or coworkers; and be likely to be off task greater than 20 percent of the time during an 8-hour workday. (R. at 92.) The ALJ asked if the hypothetical individual would be able to perform other work. (*Id.*) The VE responded that this hypothetical individual would not be able to successfully engage in competitive employment. (*Id.*) The VE stated that his testimony was consistent with the DOT. (R. at 93.)

Plaintiff's attorney asked the VE if his responses to the ALJ's hypothetical were limited to the functional abilities and limitations in her questions. (R. at 93.) The VE responded that they were. (*Id.*) Plaintiff's attorney asked if all the jobs the VE described were full-time positions, and the VE responded that they were. (*Id.*) He then asked if the limitation to simple instructions and simple tasks in the ALJ's first hypothetical eliminated very detailed work. (R. at 93-94.) The VE responded that it eliminated detailed or semi-skilled work. (R. at 94.) He asked the VE to describe

16

which aspects of a cleaner/housekeeper's job would be performed in a seated position, since the ALJ's hypothetical limited the individual to 6 hours standing in an 8-hour workday. (*Id.*) The VE responded that the job was primarily performed in while standing; any seated position would be during regularly scheduled breaks or periodically while doing some cleaning. (*Id.*)

Plaintiff's attorney asked the VE to consider the ALJ's first hypothetical, and specifically, whether the individual's extreme loss of ability to behave in an emotionally stable manner could impact the hypothetical individual's ability to perform past work or the jobs described. (R. at 94-95.) The VE responded that the individual would likely be unable to retain permanent employment after the initial probationary period. (R. at 95.) Plaintiff's attorney next asked what impact it would have if the hypothetical individual had an extreme loss of ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) The VE responded that the individual would not be able to retain permanent employment after the probationary period. (R. at 95-96.) He then asked if it would preclude work if the hypothetical individual could maintain concentration or attention, or stay on task, for only 2-hour periods. (R. at 96.) The VE responded that those limitations would match the ALJ's second hypothetical, and would preclude work. (*Id.*) Finally, Plaintiff's attorney asked the VE how many absences were generally allowed in Plaintiff's past work or the other work he described. (*Id.*) The VE responded that employers generally allowed one day per month of unexcused absences, and some could be more tolerant, but most would not. (*Id.*) If an employee were missing two days or more per month on the regular basis, that would lead to termination. (*Id.*)

## C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on April 26, 2016. (R. at 10-25.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date she filed

her application on April 24, 2014.  (R. at 15.)  At step two, the ALJ found that she had the following severe impairments: bilateral plantar fibroma; amblyopia of the right eye; morbid obesity; and bipolar II disorder.  (*Id*.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (*Id*.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, except she could: occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; never do work requiring depth perception; never work at unprotected heights; never work around moving machinery; understand, remember, and carry out simple instructions; and occasionally interact with the public and coworkers.  (R. at 17.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (R. at 20.)  At step five, the ALJ found that transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform.  (*Id*.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since April 24, 2014, the date the application was filed.  (R. at 22.)

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

18

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    Did the ALJ misperceive the evidence in determining the severity and limiting effects of Plaintiff's mental impairment?

       The Plaintiff contends that the answer is "Yes."

2.    Did the ALJ improperly reject medical opinion evidence and improperly substitute her own medical judgment to determine the severity of Plaintiff's mental impairments?

       The Plaintiff submits that the answer is "Yes."

(doc. 16 at 2-3.)

### IV. RFC ASSESSMENT[4]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

(doc. 16 at 4, 10.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating

_____

[4] Because both of Plaintiff's issues implicate the ALJ's RFC assessment, they will be considered together.

physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson*, 864 F.2d at 343 (citations omitted).

## A.    Consideration of Evidence

Plaintiff argues that the ALJ "misperceived the medical evidence" and failed to properly evaluate the evidence of the severity of her bipolar disorder in determining her RFC.  (doc. 16 at 4-8;

*see* doc. 18 at 2-4.)[5]  The Commissioner responds that the evidence supports the ALJ's findings. (doc. 17 at 7-17.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it.  *Leggett*, 67 F.3d at 564.  In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Id*. (citing *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984)); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)).  Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision.  *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986).  An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence.  *Armstrong*, 814 F. Supp. at 1373.

There is no general duty to explain or provide rational and logical reasons for a decision, however.  *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *see Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *Escalante*, 2015 WL 1443000, at *14).  The regulations require only that an ALJ consider and evaluate medical opinions.  *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  The regulations also require the ALJ to consider evidence from "other sources" because it might show the severity of an impairment and how it affects a claimant's ability to

_____

[5] Although Plaintiff notes that the ALJ failed to apply the proper legal standard in determining her severe impairments, she does not raise this as an issue because the ALJ still found that "Plaintiff ha[d] the severe mental impairment of bipolar disorder."  (doc. 16 at 4.)

function. SSR 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). They do not require an ALJ

to state the weight given to each symptom and diagnosis in the administrative record, however. *See*

*Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept.

16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Here, the ALJ clearly considered the medical evidence in the record, which showed that

Plaintiff visited Metrocare for treatment "on a near monthly basis," but "also periodically had 'no

show' notes in her file without explanation for her failure to appear for treatment."[6] (R. at 18.) The

Metrocare records indicated that Plaintiff's symptoms of bipolar disorder were reasonably well-

controlled on medication. (R. at 368, 378, 431-32, 435-36, 583, 588, 595, 603.) They also indicated

that Plaintiff's mental status examinations were mostly consistent throughout treatment, and Plaintiff

was consistently "cooperative, friendly, well-groomed, [and] had normal speech, fair impulse,

insight and judgment, normal memory, and impaired attention," as found by the ALJ. (R. at 325,

331, 336, 342, 347, 353, 358-59, 364-65, 368-69, 371-72, 347-75, 378-79, 382, 385-86, 431-32, 435-

36, 569-70, 573-74, 578-79, 583-84, 588-89, 595-96, 603-04, 613-14, 619-20; *see* R. at 18.) The

ALJ noted that this evidence showed that Plaintiff's bipolar disorder was of low to moderate

severity. (R. at 18.)[7] The ALJ also considered that the medical records showed Plaintiff's symptoms

of bipolar disorder occasionally became worse, but noted that this often occurred when Plaintiff

---

[6] Plaintiff asserts that some of the treatment records the ALJ relied upon have limited relevance because they predate the alleged onset date. (doc. 16 at 7.) The Fifth Circuit has recognized that examinations that predate the onset date are relevant and should be considered by the ALJ, especially when they pertain to the impairment alleged to be disabling, however. *Williams v. Colvin*, 575 F. App'x 350, 354 (5th Cir. 2014) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)).

[7] The ALJ stated that Dr. Ofomata noted that Plaintiff's bipolar disorder was of low to moderate severity. (R. at 18 (citing R. at 382).) As pointed out by Plaintiff, this note from Dr. Ofomata does not appear in the record. (*See* doc. 16 at 7-8.) Although that level of severity does not appear in the record, the ALJ cited to and discussed additional medical evidence of record which she found to support a finding that Plaintiff's bipolar disorder was of low to moderate severity. (*See* R. at 18-19.)

missed appointments, and her symptoms would improve following treatment and adjustments to her medication.  (R. at 569-71, 573-75, 583, 588-85, 588-90; *see* R. at 18.)  Additionally, Metrocare records examined by the ALJ also contained comments that Plaintiff was able to perform activities of daily living.[8]   (R. at 432, 436, 613, 619; *see* R. at 18.)  Because the ALJ relied on medical evidence in the record in making her RFC determination, her assessment was supported by substantial evidence.  *See Winston v. Berryhill*, 3:16-CV-419-BH, 2017 WL 1196861, at *10–11 (N.D. Tex. Mar. 31, 2017); *see also Greenspan*, 38 F.3d at 236 (noting that in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).[9]

## B.    Lay Opinion

Plaintiff also argues that the ALJ improperly substituted her medical judgment for the opinion evidence of record regarding Plaintiff's mental impairments in determining her RFC in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995).  (doc. 16 at 8-10.)  The Commissioner responds that the ALJ relied on the opinion evidence and properly considered other evidence.  (doc. 17 at 17-24.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion.  *Ripley*, 67 F.3d at 552.  The Fifth Circuit noted that although an ALJ

---

[8]  Plaintiff argues that the although the ALJ noted Plaintiff's ability to independently perform activities of daily living, she "did not refer to the statement" from Metrocare records "that Plaintiff fail[ed] to complete activities independently."  (doc. 16 at 5.)  As noted, however, the ALJ's RFC determination may be supported by substantial evidence even if she does not specifically discuss all the evidence.  *Falco*, 27 F.3d at 163–64.

[9]  Although Plaintiff also states that the ALJ's "conclusions as to Plaintiff's credibility are not supported by substantial evidence," she does not expressly raise an issue regarding the ALJ's credibility determination.  (*See* doc. 16 at 7-8.)

should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id*. Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id*. The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id*. The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id*. at 557–58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id*. at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

Here, the ALJ considered Dr. Ofomata's medical assessment of Plaintiff's mental ability to perform work-related activities. (R. at 19.) Dr. Ofomata opined that Plaintiff had substantial to extreme loss of ability in the areas of understanding and carrying out instructions; sustaining concentration and persistence; responding appropriately to supervision, co-workers, and usual work situations; and adapting to changes in a routine work setting. (R. at 565-66.) The ALJ expressly gave "little weight" to Dr. Ofomata's opinion, finding that "the evidence of record did not support the significant restrictions stated by [him] . . . ." (R. at 19.) The ALJ then considered opinions from two SAPCs who opined that Plaintiff was not limited in the areas of understanding and memory, and was no more than moderately limited in the areas of sustained concentration, persistence, social

26

interaction, and adaptation.  (R. at 127-28, 139-41.)  The SAPCs opined that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make basic decisions, attend and concentrate for extended periods, interact with others, accept instructions, and respond to changes in a routine work setting. (R. at 128, 141.) The ALJ expressly gave the SAPC's opinions "little weight" as well, finding that the record showed Plaintiff "could not perform detailed work . . . ." (R. at 19.) In her RFC assessment, the ALJ determined that mentally, Plaintiff could "understand, remember, and carry out simple instructions and occasionally interact with the public and coworkers." (R. at 17.)

While the ALJ may choose to reject the opinions of Dr. Ofomata and the SAPCs, "[s]he cannot independently decide the effects of Plaintiff's . . . impairments on [her] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12–CV–1705–BK, 2013 WL 991252, at *5 (N.D. Tex. Mar.13, 2013).  There are no other medical opinions in the record regarding the effects Plaintiff's mental impairments had on her ability to work, particularly in the areas of understanding, remembering, carrying out instructions, and interacting with others.  The ALJ relied on medical evidence, including treatment notes from Metrocare, in determining Plaintiff's RFC. (R. at 18-20.) None of that evidence addressed the effects of Plaintiff's conditions on her ability to work, however.  *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC).

27

The ALJ therefore appears to have relied on her own opinion, which she may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ( "[a]n ALJ may not–without the opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination). Consequently, substantial evidence does not support the mental aspect of the ALJ's RFC determination. *See Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence

supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, as in *Williams*, the ALJ's failure to rely on the medical opinions in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff is not disabled. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions in determining the RFC); *see also Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medial opinion in determining the plaintiff's RFC).

## V.    RECOMMENDATION

The Commissioner's summary judgment motion should be **DENIED IN PART**, and the Commissioner's decision should be **REVERSED IN PART**, and **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 31st day of August, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

30